# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### August 15, 2012 Session

## IN THE MATTER OF JUSTICE A. F.

**Appeal from the Shelby County Chancery Court**
**No. CH-10-0550-2    Arnold B. Goldin, Chancellor**

---

**No. W2011-02520-COA-R3-PT - Filed September 24, 2012**

---

This appeal involves the termination of a mother's parental rights. The father had a history of domestic violence toward the mother, and there was a protection order requiring the father to stay away from the mother's older children. Nevertheless, the mother went to work and left the child at issue, a toddler, and her younger sibling in the care of the father. While the mother was at work, the father murdered the infant sibling. After that, the child at issue was found to be dependent and neglected and the mother was found to have committed severe abuse based on her failure to protect the child from the father. The mother did not appeal this ruling. Thereafter, the Tennessee Department of Children's Services filed this petition to terminate the mother's parental rights, with grounds of severe abuse already established. After a trial, the trial court terminated the mother's parental rights. The mother now appeals only the finding as to the child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Viola E. Johnson, Memphis, Tennessee for Respondent/Appellant T.L.A.

Robert E. Cooper, Jr., Attorney General, Lindsey O. Appiah, Assistant Attorney General, and Martha Campbell, Assistant Attorney General, Nashville, Tennessee for Petitioner/Appellee State of Tennessee Department of Children's Services

# OPINION

## FACTS AND PROCEEDINGS BELOW

This termination of parental rights case arises out of a horrifying crime, the murder of a three-month-old infant. The events leading up to the murder are pertinent, so we recount them in some detail.

The child that is the subject of this appeal, Justice A. F. ("Justice"), is the daughter of Petitioner/Appellant T.L.A. ("Mother") and J.E.F. ("Father"), and was born on February 17, 2007. Mother and Father also had a younger daughter, Jalissa, born on May 14, 2008.[1] In addition, Mother has four older children; Father is not the biological parent of the older children.

The Tennessee Department of Children's Services ("DCS") first became involved with this family in June 2006, when it received a report that Father had sexually abused Mother's oldest child. The abuse allegations were substantiated and the children were taken into protective custody. The children were returned to Mother's custody in October 2006. The record indicates that Mother was told at that time that her older daughters were not to have contact with Father. The child at issue, Justice, was born to Mother and Father during this time period, in February 2007.

Approximately a year after the older children were returned to Mother's custody, in October or November 2007, the three older children were again taken into protective custody because Father was still frequenting Mother's home. In July 2008, the juvenile court entered a no-contact order, prohibiting Father from any contact with Mother's older children. Prior to the entry of the no-contact order, in May 2008, Mother's second daughter with Father, Jalissa, was born. Throughout this time, the child at issue in this appeal, Justice, remained in Mother's care.

On August 14, 2008, Mother left Justice and infant Jalissa with Father while she went to work. When Mother returned home late from work, an altercation ensued and the police were called. After the police arrived, Father made threats against Mother and her family. Father was escorted off of Mother's property.

Four days later, on August 18, 2008, Father was at Mother's home at approximately 5:30 a.m., when it was time for Mother to leave for work. When Father asked Mother to leave

---

[1] Mother now also has a son, five months old at the time of trial and living with Mother. Mother's parental rights as to this son are not at issue in this appeal.

Justice and Jalissa in his care while she was at work, Mother acquiesced instead of leaving the children with their regular caretaker. This would prove to be a fatal mistake.

In the early afternoon that same day, Father called Mother at work and told her that two-year-old Justice had hit three-month-old Jalissa with a box of baby wipes. Father assured Mother that Jalissa was fine. When Mother returned home from work, Father told her that Jalissa was asleep and then he left. Later, when Mother finally checked on Jalissa, she found the small infant "unresponsive and very cold" in her crib. Mother called 911, but it was too late; Jalissa was dead. DCS immediately took Justice into protective custody.

Later, authorities determined that Jalissa died from "multiple blunt force trauma." The perpetrator of the murder was Father. Ultimately, Father pled guilty to second degree murder and aggravated child abuse. He was sentenced to 25 years incarceration.

DCS filed a petition in the juvenile court, seeking a declaration that Justice was dependent and neglected. The dependency and neglect petition was heard in June 2009. The juvenile court magistrate declared Justice dependent and neglected pursuant to Tennessee Code Annotated § 37-1-102(b)(12)(F) and (G). The juvenile court magistrate also held that Justice was a victim of "severe abuse" pursuant to Tennessee Code Annotated § 37-1-102(b)(21)(A)[2] as a result of "the severe physical abuse of her deceased sibling [Jalissa] by their father . . . and [Mother's] failure to protect Justice from this abuse." The order of the juvenile court magistrate commented that "due to the history of abuse and neglect in this family . . . the mother has a pattern of very poor decision-making and has willfully failed to protect her children." The juvenile court magistrate's holding of severe abuse against Mother was confirmed in an order entered by the juvenile court judge the same day. This order was not appealed.

On March 23, 2010, DCS filed a petition in the Chancery Court of Shelby County, Tennessee to terminate the parental rights of both Mother and Father as to Justice.[3] As grounds for termination of Mother's parental rights, the petition cited the juvenile court's finding of severe abuse.

---

[2]Tennessee Code Annotated § 37-1-102(b)(21)(A), defining "severe child abuse" has been recodified at Section 37-1-102(b)(23). In this Opinion, we will refer to the most recent codification.

[3]The termination of Father's parental rights is not at issue in this appeal.

The trial was held on August 15, 2011. Because Father was incarcerated at the time for the murder of infant Jalissa, he participated in the proceedings by telephone.[4] At the outset, the juvenile court's order, finding severe child abuse as against Mother, was entered into evidence. Under Tennessee Code Annotated § 36-1-113(g)(4), this established a ground for termination of Mother's parental rights. *See In re Samaria S.,* 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011). Therefore, the testimony at trial addressed the remaining issue of whether termination of Mother's parental rights was in the best interest of her daughter Justice.

The trial court heard first from the DCS case manager assigned to the family, Letina Pruitt ("Pruitt"). Pruitt had been involved with this family since 2008. Pruitt said that Mother had made some efforts to improve as a parent. She said that Mother had undergone a psychological assessment with a clinical psychologist at the Family Exchange Center and had done some counseling though the Exchange Club. Mother attended domestic violence classes and grief classes as well. Mother had maintained a schedule of visitation with Justice. Pruitt stated that Mother has always had employment, but she had moved five or six times since Justice was taken into protective custody, so there were concerns for her stability.

The primary concern that Pruitt expressed in her testimony was that Mother had neither expressed remorse nor taken responsibility for her part in the events that led up to the murder of her child by Father. When Pruitt talked to Mother about the incident, Pruitt said, Mother would explain that "she wasn't at home when the event occurred, she was at work" or ask rhetorically "how can she be held responsible." Pruitt testified that she took Mother's statements to mean that she "didn't want to be responsible for what happened to the child. She didn't want to share in the responsibility."

Pruitt also testified about how Justice had fared since being taken into DCS protective custody. Justice was placed in three different foster homes until June 2010, when she was finally placed in her foster home at the time of trial. In her current foster home, Pruitt said, Justice was doing well and seemed well adjusted. Pruitt said that Justice has bonded with her foster mother and calls her "Mommy," and the foster mother wants to adopt the child. Pruitt described difficulties and regression in Justice's behavior that often followed the child's visitation with Mother or occasions when the child saw Mother in court. After such exposure to Mother, Pruitt said, Justice would pull her hair out, urinate on herself, or engage in aggressive behavior such as fighting or kicking her foster parent. Pruitt stated that Justice's behavior has greatly improved since she was placed with her current foster family, and returning the child to Mother's custody would likely cause regression and other

---

[4]It appears that Father participated primarily to assert that termination of Mother's parental rights would not be in the child's best interest. Father told the Juvenile Court that Mother is "a good woman," but did not otherwise offer substantive testimony.

problems. Pruitt stated that she believed that termination of Mother's parental rights would be in Justice's best interest and would allow the child to achieve some stability and permanency.

Justice's current foster mother ("Foster Mother") testified, corroborating much of Pruitt's testimony about the child. When Justice first arrived at her home, Foster Mother said, she exhibited numerous behavioral problems, such as defiance, temper tantrums, urinating on herself, and had almost no hair left from having pulled much of her own hair out of her head. Foster Mother testified that many of those behavioral issues had subsided, and by the time of trial, the child was obedient and well-mannered. Foster Mother confirmed that she hoped to adopt Justice.

The trial court heard testimony from Catherine Collins, Ph.D. ("Dr. Collins"), a licensed clinical psychologist and the clinical director of the Exchange Club Family Center. Dr. Collins specializes in child and family psychology, and part of her work includes psychological assessments of parents and children, to evaluate whether the parent is psychologically able to provide the child with a safe, appropriate environment. In this case, she evaluated Mother and Justice, separately and together. This involved taking a history of each, gathering collateral information from records, family, foster parents, and DCS, and also direct observation and interviews. Dr. Collins relayed her observations and conclusions to the trial court through her testimony and her written report.

Dr. Collins observed Justice in December 2008, when the child was approximately 22-months-old. She said that Justice appeared to be "a withdrawn child with very little emotional expression" and was "more isolated, more resistant to contact being made and didn't initiate a lot of contact herself, which is not typical of a toddler." Dr. Collins observed Mother interacting with several of her children, including Justice, and Dr. Collins reported what she saw:

> [Mother's] affect was flat and she seemed detached from her children. She showed no enjoyment in interacting with them. Although there was interaction between [Mother] and her children, this was typically initiated by her children, not [Mother]. She often spoke harshly and in a commanding tone, telling the children to do something or stop doing something. There was little positive interaction between [Mother] and her children . . . . She showed little reaction when the children left.

Despite the fact that Mother described her relationship with Justice as "good," Dr. Collins saw a "lack of attachment between [Mother] and Justice." In fact, Dr. Collins saw little attachment between Mother and any of her children, but described Mother's "attachment

with Justice [as] particularly poor." Dr. Collins explained that her conclusions stemmed in part from seeing how the child related to Mother: "Justice's overall presentation suggests general attachment issues and hopelessness that are potentially due to a history of abuse, deprivation, or lifestyle instability." In Mother's presence, Dr. Collins' report stated, Justice presented as a "depressed child" with a flat affect. The child used few words in response to her mother's questions, protested when people attempted to touch her, did not attempt to engage any of the other children in play, and "did not really attempt to engage her mother in a sustained interaction."

Dr. Collins said that Mother's history included incidents in which she was a victim of child sexual abuse, as well as several adult relationships in which she suffered domestic violence. From the history taken directly from Mother and collateral information used in the evaluation, Dr. Collins said that Mother has a "history of staying in relationships that were not good for her and that were abusive." Mother's relationship with Father was cited by Dr. Collins as an example. Asked about the status of her relationship with Father, Dr. Collins reported, Mother acknowledged that "she had given him his chances previously" but insisted that "[Mother] was quite sure that at this point she was finished with him and would not have anything more to do with him because she wanted to have her children returned." However, the collateral information Dr. Collins received from several sources indicated that Mother maintained a relationship with Father after her older daughter reported sexual abuse by him, told the daughter to lie about the abuse, remained intimate with Father, and permitted Father to have contact with her younger children long after the guardian ad litem and DCS warned Mother that it was not safe to do so. Dr. Collins reported that Mother even continued to visit Father after he was incarcerated for murdering her infant daughter. Dr. Collins observed that Mother was "untruthful" even when doing so endangered her children. She concluded that Mother "tends to take little responsibility for her own actions, distort reality to meet her own goals, and present herself in an overly positive light." Dr. Collins expressed particular concern about Mother's "lack of remorse regarding her daughter's death, as well as her failure to take responsibility for her actions in this situation." She had recommended individual therapy for Mother to deal with these serious issues; Mother scheduled three individual therapy appointments, but she failed to show up for any of them. Dr. Collins concluded that "it is unlikely that [Mother] will be able to provide a safe, stable, nurturing environment for Justice" and recommended that the child not be returned to Mother's custody.

Mother also testified. She maintained that she had completed all of the goals in the DCS permanency plan, including attending parenting classes, attending domestic violence counseling, attending grief counseling, providing a stable home, maintaining employment, regular visitation with Justice, and obtaining an initial mental assessment. Mother acknowledged that she lost custody of her three oldest children based on allegations that

Father had sexually abused them, and that the juvenile court issued a no-contact court order as to Father. Mother clarified, however, that the no-contact order was only as to her oldest three children and made the additional comment that Father was never actually convicted of sexually abusing her daughter. When Mother was asked whether she had maintained a relationship with Father after the Court issued the no-contact order, the following exchange ensued:

> Q: And then you still had a relationship with [Father]; correct?
> A: No.
> Q: But you did end up having another child with [Father]?
> A: I was in a domestic violence situation.
> Q: But to answer the question, you did have another child with [Father]?
> A: Yes.
> Q: And that child was Jalissa; correct?
> A: Jalissa.
> * * *
> Q: Did that not cause you any concern, to continue to be with [Father] at the time?
> A: I wasn't with [Father].
> Q: I'll move on from that.

Prior to losing custody of Justice, Mother conceded, there had been incidents of domestic violence with Father, at least one in which Father threatened her family and she had to call the police. However, she quickly added: "There wasn't any indication of abuse as far as his children goes, because he kept Justice basically all the time before I had Jalissa." When asked how the children came to be left in Father's care on the day her infant daughter was murdered, Mother explained that, at the time, she "didn't see anything wrong" with leaving the children with Father, emphasizing: "There wasn't a court order saying he couldn't be there with his children."

Mother described to the trial court the changes she had made in her life since Jalissa's death. Due to the counseling in which she participated, Mother stated: "I know how to better take care of my children now. There is no one in the home that can physically or even harm my children. I know now how to characterize people better." Mother said: "[T]he person that I was then I am not now." She asserted that she is better able to take care of her children than she was in 2008 and pointed to the fact that, at the time of trial, she was taking care of her five-month-old son.

At the conclusion of proof, the trial court issued an oral ruling, finding by clear and convincing evidence that termination of Mother's parental rights was in Justice's best interest

and granting DCS's petition for termination. The oral ruling was followed by a written order in which the trial court order found as follows:

> Pursuant to Tennessee Code Annotated section 36-1-113(i)(1)-(9), termination of parental rights is in the best interest of [Justice] based upon the following: that [Mother] has failed to make such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home due to domestic violence issues and the failure to protect children from abuse or neglect; that a no-contact order has been entered against [Mother] due to her failure to protect and that a meaningful relationship has not otherwise been established between her and the child; that Dr. Catherine Collins testified that it is unlikely that [Mother] [could] provide a safe, stable home environment for Justice based upon the mother's history and abilities; that Justice is flourishing in her foster home, which gives Justice a chance to have a safe and stable home; that Justice finally has the chance to achieve permanency through adoption and that a change of caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological and/or medical condition.

Mother now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother argues that the trial court erred in finding that termination of her parental rights was in the minor child's best interest.

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1) (2012). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Adoption of A.M.H.,* 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); *In re Askia K. B.,* No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *20 (Tenn. Ct. App. Oct. 7, 2011).

The heightened burden of proof in cases involving the termination of parental rights serves to minimize the risk of an erroneous decision. *In re M.J.B.,* 140 S.W.3d 643, 653 (Tenn. Ct.

App. 2004).  Evidence satisfying the clear and convincing evidence standard must establish that the truth of the facts asserted are "highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *13-14 (Tenn. Ct. App. Jan. 10, 2008) (citing *In re Valentine*, 79 S.W.3d at 546; *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9; 2003 Tenn. App. LEXIS 569, at *26 (Tenn. Ct. App. Aug. 13, 2003)).  Clear and convincing evidence must produce a firm belief or conviction in the fact finder's mind regarding the truth of the facts sought to be established.  *In re A.T.P.*, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *14 (citing *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001)).  "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted, is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

Because of the clear and convincing evidence burden of proof in parental termination cases, appellate courts must adapt the customary standard of review as set forth in Rule 13(d) of the Tennessee Rule of Appellate Procedure.  *In re Tiffany B.,* 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007); *In re Audrey S.,* 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).  First, each of the trial court's specific factual findings must be reviewed *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it.  *In re Tiffany B.*, 228 S.W.3d at 156; Tenn. R. App. P. 13(d)(2011).  When the trial court's factual findings are based on the assessment of a witness's credibility, this Court will afford great weight to those determinations and will not reverse such determinations absent clear evidence to the contrary.  *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005).  Second, the appellate court must decide whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights.  *In re Audrey S.,* 182 S.W.3d at 861; *In re Askia K. B.,* 2011 WL 4634241, at *7.  The trial court's conclusions of law, including its conclusion that the State presented clear and convincing evidence to support termination, are reviewed *de novo* with no presumption of correctness. *See In re the Adoption of A.M.H.*, 215 S.W.3d at 810; *In re Tiffany B*., 228 S.W.3d at 156.

## ANALYSIS

A biological parent's right to the care and the custody of her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions.  *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d at 809; *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn.

1993); ***In re Giorgianna H.***, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons, it is not absolute. ***In re Giorgianna H.***, 205 S.W.3d at 515 (citing ***DCS v. C.H.K.,*** 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. ***Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002); ***In re M.J.B.***, 140 S.W.3d at 653. "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." ***In re M.J.B.***, 140 S.W.3d at 653 (citing ***M.L.B. v. S.L.J.***, 519 U.S. 102, 119 (1996)).

As noted above, Tennessee statutes require the party seeking termination of parental rights to prove both grounds for termination and that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). In this case, the State relied upon the juvenile court's prior finding of "severe abuse" as the ground for termination of Mother's parental rights. This is specifically permitted in the statutes governing termination actions. ***See*** Tenn. Code Ann.§ 36-1-113(g)(4); ***In re Samaria S.,*** 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011). Mother does not appeal the trial court's finding on the ground for termination, so we look only to the evidence on whether termination of Mother's parental rights is in the best interest of her child.

The statutes governing the termination of parental rights direct trial courts to consider a number of factors to evaluate the child's best interest. ***See*** Tenn. Code Ann. § 36-1-113(i).[5]

---

[5]Section 36-1-113(i) states:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(continued...)

This list of factors "is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child."  *In re M.A.R.*, 183 S.W.3d at 667.

Mother's arguments on appeal focus on the trial court's findings as to three of the factors set forth in Section 36-1-113(i), specifically: subsection (1), failure to adjust circumstance, conduct, and conditions to make the parent's home safe for the child; subsection (4), a meaningful relationship between parent and child; and subsection (5), the effect a change in caretakers would have on the child.  Tenn. Code Ann. § 36-1-113(i)(1),(4), and (5).

Mother argues first that the trial court erred in finding that Mother had not made an adjustment of circumstance, conduct, or condition.  She criticizes the testimony of DCS case worker Pruitt as "contradictory and conclusive and self-serving," noting that Pruitt suggested that Justice needs permanency and stability, and yet, DCS has moved the child to several foster homes since her placement in the system in 2008.  Mother also contends that the trial court erred in relying on Dr. Collins' report because it was prepared only four months after the death of her daughter Jalissa and there had been little time for rehabilitation at that time.

---

[5](...continued)

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(2011).

Although Mother acknowledges that she did not undergo the individual psychotherapy that Dr. Collins recommended, she points out that she completed two of Dr. Collins' three recommendations, namely, a parenting course and domestic violence program.

We dispense immediately with Mother's apparent contention that the fact that DCS has had to move Justice from one foster home to another leaves the agency in no position to argue that the child needs permanency and stability. This is sheer sophism. The child's need for permanency and stability is a central tenet of our statutes on the termination of parental rights and must be considered regardless of DCS's actions.

Mother also criticizes the trial court's decision to credit the testimony of DCS case worker Pruitt and psychologist Dr. Collins on the adjustments Mother had made. As noted above, the trial court's assessment of the witnesses' credibility is accorded great deference on appeal, and will not be reversed absent clear evidence to the contrary. *In re M.L.D.*, 182 S.W.3d at 894 (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). Mother offered little evidence to contradict the primary points emphasized by Ms. Pruitt and Dr. Collins. Both of the witnesses acknowledged the fact that Mother had housing, remained employed, visited with Justice, and that she attended parenting classes, domestic violence classes, and grief classes. But the main point emphasized by both witnesses – Mother's lack of insight into how she contributed to the death of her child – was corroborated by Mother's own testimony. Both Pruitt and Dr. Collins noted that Mother declined to undergo the individualized psychotherapy recommended for her, and Mother does not dispute this. Mother asserted at trial that she "know[s] now how to characterize people better" and said that, with Father incarcerated, there was no one in her home who would physically harm her children. These assertions are scant comfort in light of the record as a whole. In fact the remainder of Mother's testimony underscored the very points stressed by Pruitt and Collins: that Mother displayed no understanding of her share of the responsibility for the death of her child, and that she distorted reality in order to present herself and her choices in a positive light. Despite Father having shown himself repeatedly to be someone who was a danger to those around him, and most especially to the children around him, Mother again and again not only allowed the children to come in contact with him, she left them alone with him and utterly without protection. Mother saw nothing wrong with having done this, except for the tragic result. Mother's own testimony showed that, in the aftermath of the murder of her infant daughter by Father, she had gained no insight into her choice to place her children in such terrible danger. Based on Mother's own testimony, we find that the evidence preponderates in favor of the trial court's finding that Mother has not made an adjustment to her circumstances.

Mother contends as well that the trial court erred in finding that there was no meaningful relationship between Mother and Justice. Mother argues that the trial court essentially

adopted the juvenile court's findings in the dependency and neglect proceedings and incorporated them into the order on appeal. Mother also asserts that the trial court distorted the testimony of Dr. Collins by disregarding her discussion of the potential for reunification and ignored the fact that Mother completed most of Dr. Collins' recommendations. Mother also insists that the trial court erred in considering the testimony of Foster Mother, "who highlighted the child's difficulties for her own self-serving purposes."

After carefully reviewing the record as a whole, we find ample evidence to support the trial court's conclusion that Mother did not have a meaningful relationship with Justice, and its finding that a change in caretakers would be highly detrimental to the child. Tenn. Code Ann. § 36-1-113(i)(4) and (5). Again, the trial court's decision to credit the testimony of Pruitt, Foster Mother, Dr. Collins, or any other witness, is entitled to great deference on appeal. The evidence, especially Dr. Collins' report, clearly shows that Justice was not emotionally attached to Mother. Indeed, the record includes substantial evidence that exposure to Mother causes the child to exhibit multiple symptoms of distress. Conversely, the testimony of both Pruitt and Foster Mother indicated that Justice is doing well in this foster home and many of her behavioral issues have subsided since becoming settled with her foster family. Mother offered no evidence, through her own testimony or otherwise, contradicting the testimony of Pruitt, Foster Mother, or Dr. Collins on Justice's relationship with Mother or with her foster family. Thus, we find that the evidence preponderates in favor of these factual findings as well.

Considering the trial court's specific factual findings and the record as a whole, we find clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in the best interest of the child. Thus, we affirm the trial court's decision to grant the petition to terminate Mother's parental rights as to her daughter Justice.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are assessed against Appellant T.L.A., for which execution may issue if necessary.

_____

HOLLY M. KIRBY, JUDGE

-13-